*425
 
 O’NIELL, Chief Justice.
 

 The plaintiff is appealing from a judgment dismissing his suit to collect a bill of $2,150 for professional services rendered by him as physician and surgeon. The services extended over a period of ten months and included several successful major operations, made necessary by an accident that injured the defendant critically.
 

 Soon after he recovered from his injuries, the defendant, Hunnewell, filed a petition in bankruptcy and listed the plaintiff, Dr. Irwin, as a creditor for the $2,150, and was discharged.
 

 Dr. Irwin claims that, in three separate instances, subsequent to the bankruptcy proceedings, Hunnewell acknowledged the debt and, directly or by necessary implication, promised to pay it. The doctor avers, specifically, that Hunnewell, after his discharge in bankruptcy, sent a message by a friend, Griffin C. Connell, to Dr. John F. Oakley, who was then the full-time assistant of Dr. Irwin, to inform him that he, Hunnewell, acknowledged his obligation to pay Dr. Irwin the $2,150, and promised that he would pay it, notwithstanding his discharge in bankruptcy. The doctor avers that similar promises were made by Hunnewell in two letters addressed to Dr. Irwin, one on the 1st and the other on the 5th day of May, a few months after the discharge in bankruptcy. The only question in the case is whether there was a definite promise made by Hunnewell to pay the debt, either , in the message which he sent by his friend Connell to Dr. Oakley, or in either of the letters addressed to Dr. Irwin. For it is well settled and is conceded that a promise to pay a debt from which the debtor has been discharged in a bankruptcy proceeding, to be effective, must be direct and definite. A mere acknowledgment of such a debt, with an expression of intention to pay it at some indefinite time, is not an enforceable obligation. Bach v. Cohn, 3 La.Ann. 101; Beck v. Howard, 3 La.Ann. 501; Linton v. Stanton, 4 La.Ann. 401; Bartlett v. Peck, 5 La.Ann. 669; Glenn v. Dunbar’s Adm’x, 10 La.Ann. 253; Collier on Bankruptcy, 13th Ed., Vol. 1, § 17, p. 643; Gilbert’s Collier on Bankruptcy, 4th Ed., § 17, p. 385; 8 C.J.S., Bankruptcy, § 583, p. 1571; 6 Am.Jur., Bankruptcy, § 532, p. 832; Allen & Co. v. Ferguson, 18 Wall. 1, 85 U.S. 1, 21 L.Ed. 854.
 

 The judge of the civil district court found that there was no definite promise on the part of Hunnewell, made either directly or by necessary implication, in the message which Hunnewell sent by Connell to Dr. Oakley, or in either of the letters which Hunnewell wrote to Dr. Irwin. And we concur in that finding.
 

 Hunnewell, Connell and Dr. Oakley all testified that their recollection was that the message which Hunnewell sent by Connell to Dr. Oakley was sent before and in anticipation of Hunnewell’s filing a petition in bankruptcy, and that Hunnewell’s purpose in sending the message to Dr. Oakley was to assure Dr. Irwin that, notwithstanding it was necessary to list him as a creditor for the $2,150, he, Hunnewell, intended to pay the debt after receiving his discharge in bankruptcy. Of course, if the message was sent before
 
 *427
 
 Hunnewell filed his petition in bankruptcy, the message could not have any binding effect now, even if it did constitute a definite promise to pay the debt.
 

 Dr. Irwin testified that the message was delivered to him promptly by Dr. Oakley and that 'it was delivered after Hunnewell obtained his discharge in bankruptcy. In the letter which Hunnewell wrote to Dr. Erwin on May 5th he referred to the message which he had sent by Connell to Dr. Oakley as if it had been sent in December, which would have been about a month after Hunnewell filed his petition in bankruptcy. The only way in which that admission in Hunnewell’s letter of May 5th could be reconciled with his testimony, or with that of Connell and Dr. Oakley, with reference to the date on which Hunnewell sent the message to Dr. Oakley, would be to assume that Hunnewell, in his letter of May 5th, was mistaken in referring to the date of his sending the message as being in December.
 

 Assuming, however, that Hunnewell’s sending of the message by Connell to Dr. Oakley was subsequent to the date of Hunnewell’s discharge in bankruptcy, we find that there was no definite promise in the message, either expressed or implied. Connell testified that the only message that Hunnewell asked him to convey to Dr. Oakley was that he, Hunnewell, felt that he owed his life to Dr. Oakley, and that while it was necessary for him to include Dr. Oakley’s bill in his list of liabilities he intended as soon as possible to pay the bill. Connell testified also that Hunnewell did not say anything about paying Dr. Irwin, or request Connell to deliver any message to Dr. Irwin. We assume that, in referring to the bill of Dr. Oakley, Connell had reference to the bill of Dr. Irwin, because Dr. Oákley, being a full-time assistant of Dr. Irwin, received a regular salary from Dr. Irwin for his services, and did not render a bill for the services which he rendered as Dr. Irwin’s assistant. Dr. Oakley testified, as a witness for Dr. Irwin,, that his recollection of the message which Connell delivered was that Hunnewell had gotten into some financial difficulties and had gone into bankruptcy — -or contemplated going into bankruptcy — “but that the bill for Dr. Irwin’s services was to be taken care of”. That was not a definite promise to pay the debt, — certainly not a promise to pay it within any specified time. Dr. Irwin testified that the message delivered to him by Dr. Oakley was, in effect, that he, Dr. Irwin, “should have no worry — that the bankruptcy proceedings would have nothing to do with the payment of the account — that it would be paid — that he [Hunnewell] had found it necessary to go into bankruptcy”. Dr. Irwin admitted that Dr. Oakley did not tell him that Hunnewell had promised to pay a certain or definite sum, or to pay any sum within a specified time. Dr. Irwin admitted also that he never asked Hunnewell to confirm the message delivered by Dr. Oakley.
 

 Hunnewell’s letter to Dr. Irwin, dated May 1st — or the part which is quoted and relied upon by counsel for Dr. Irwin— reads as follows:
 

 “Dear Doctor Irwin: Please don’t put me on the list of people you don’t speak
 
 *429
 
 to because so many months have elapsed or •may yet elapse without my having made a start on your bill. Since September [two ■months before the filing of the petition in bankruptcy] I have been working on my ■deficit with the Tea Company [Hunnewell’s ■employer], and since that is only a matter ■of deduction for them my salary has been chiefly a series of receipts. It has come ■down from eight hundred to about two fifty and I begin to feel as tho I were getting somewhere. These things seem to come in bunches — and with my other little woes I’ve acquired some of my family’s. My father is in the building supply business and since January has been without any income whatever. Mother took on a job in New Rochelle as a librarian and while all that will soon clear up — I hope — it’s been rather a hard winter.
 

 “I can only say that after the Tea Company you come first, and trust that you wont object to being anything but first. You don’t remember asking me what difference it made if it took me the rest of my life to pay for one bad evening? I didn’t think you’d be so liberal!”
 

 Hunnewell’s reminder of Dr. Irwin’s having asked him what difference it would make if it took him the rest of his life to pay for one bad evening is explained by the fact that it was in consequence of one bad evening — on a Christmas night— that Hunnewell fell from a second-story gallery and thereby caused the injuries which resulted in the doctor’s bill for $2,-150. Hunnewell’s concluding statement, that he didn’t think Dr. Irwin would “be so liberal”, savors of sarcasm. The whole tone of the letter is merely a gloomy ex-plantation of Hunnewell’s failure — because of his financial inability — to commence paying Dr. Irwin’s bill. The nearest approach to a promise to pay the bill is in the second paragraph of the letter, where Hunnewell states that, after he will have finished paying the debt due to his employer, Dr Irwin will “come first” — in the order of payment of the other creditors. But that was not a definite promise to pay the claim of Dr. Irwin — much less to pay it within a certain or specified time.
 

 In the other letter relied upon by Dr. Irwin — dated May 5th — Hunnewell complained that the doctor had informed his callers “of my debt to you”; but the debt.was referred to afterwards in the same letter as a moral obligation. Hunnewell complained also that the bill “was entirely out of proportion to” his means. He affirmed that his “intentions were good and the delay was unavoidable”. And then in the letter Hunnewell offered to turn over to Dr. Irwin a life insurance policy for $3,000, naming the doctor as beneficiary, and to pay the premiums, in lieu of payments on the debt; which offer was never accepted by Dr. Irwin. The letter reads as follows:
 

 “Doctor Irwin: It was a rather remarkable coincidence that only one day after I wrote you regarding what I have considered a perfectly reasonable delay in settling your bill, that I learned, thru people who fortunately know my side of the case, the method you have adopted to let your callers know of my debt to you. I refer to the data you have had on your desk — and
 
 *431
 
 the statements you have apparently made concerning my intention not to pay your bill —in particular your having said that I went thru bankruptcy to avoid paying the bill.
 

 “I went to considerable trouble and sat outside your office for an hour and fifteen minutes in December, to see you and explain the bankruptcy angle, and finally had to ask a friend of Dr. Oakley’s to explain the matter to him, and assure him that my bankruptcy had absolutely no bearing on your bill insofar as my moral sense of the obligation was concerned. The question of my indebtedness to you — that is, the amount of it, is certainly debatable. You have had your ideas on the subject and I have mine— and there is nothing to be gained by a further discussion of it — but I still feel that it was entirely out of proportion to what I have, or will have for sometime. I have always felt that Dr. Mcllhenny’s bill was a reflection of his ideas of the subject, and I am too familiar with things of the sort here and in New York not to realize that I was being asked too much.
 

 “You probably know what my reaction was when I was told of your comments— and yet, regardless of what you have said or how many people you have told your story to, I would still feel that I owed you a great deal for what you did. Lots of people would not feel quite that way, because the damage once done is never fully repaired — and if I paid your bill in full, most of the people who were told that I had ducked it would never hear of its being paid. I have no very great moral sense, and certainly no social position that might be injured, so I am not as upset as I suppose I should be. I object chiefly because my intentions were good and the delay was unavoidable.
 

 “I have foregone a great many things in order to get in the clear, and, had you been more reasonable in your charges and in your attitude, I think we would both be better off. I am not going to be nearly as concerned in the matter as I have been, and you can’t blame me for feeling that way.
 

 “I’ll do this much if you want to have something concrete. My balance with Mr. Peregoy and the Company will not be cleared until August. If you don’t want to wait until then and take your chances, I will make over to you, as beneficiary, a life insurance policy, in Travelers, for three thousand dollars, and agree to maintain the premiums in lieu of any future payments, with only two exceptions to the contract. First, that, if I am disabled temporarily or permanently, I benefit by the policy as it stands. Second, that if you collect the policy (and wouldn’t that give you a ‘big kick’) you will give Dr. Fenno two hundred and fifty dollars. You have something to gain and nothing to lose if you care to accept the policy, and no one is in a better position than you to know how good your chances are of coming out ahead. You can think it over and drop me a line if you care to; at least the idea is slightly original and might be quite profitable.”
 

 Dr. Irwin testified that he did not accept Hunnewell’s offer concerning the life insurance, or answer the letter of May 5th, because — as the doctor said — he was willing to wait the time stated in the letter, and take his chances that Hunnewell would pay
 
 *433
 
 the debt. In that connection the doctor testified: “The mere fact that I didn’t reply was sufficient information to him [Hunnewell] that I was willing to await the beginning of the payments after August”. Hence no obligation arose from Hunnewell’s offer to turn over to Dr. Irwin the policy of insurance.
 

 The law on this subject is the same in Louisiana as it is in the other states. The obligation of a bankrupt to pay a debt from which he has been discharged is only a moral obligation — or what the Civil Code terms a natural obligation-defined in article 1757 as “one which can not be enforced by action, but which is binding on the party who makes it, in conscience and according to natural justice.” According to article 1759 — numbered 1752 in the Code of 1825 — although such an obligation •cannot be enforced, nevertheless '“A natural obligation is a sufficient consideration for a new contract.” A mere acknowledgment of such an obligation, of course, is not a new contract. In fact, the only moral obligation of a bankrupt to- pay a debt from which he has been discharged is the obligation to pay it if he ever becomes financially able to pay it.
 

 In Bach v. Cohn, 3 La.Ann. 101, in 1848, it was held that a debtor who was discharged from his debts under the bankrupt act of Congress of August 19, 1841, 5 Stat. 440, was “still bound in the forum of conscience”, and that his obligation would be a sufficient consideration for a new promise, under article 1752 of the Civil Code of 1825, but that there could “be no legal obligation to pay such debts without a new agreement.” The court compared the act of Congress with the bankrupt statute of England, and, referring to the decisions of the English courts to ascertain the legal effect of a discharge in bankruptcy, declared :
 

 “Upon an examination of them [the decisions of the English courts] it will be found that the effect of the certificate [of discharge] may be avoided by a new contract, entered into bona fide by the bankrupt after his discharge; and that, as the debt, notwithstanding the legal discharge, is due in foro conscientiae, the moral duty is deemed a sufficient consideration to support the new promise. But we have met with no case in the English authorities in which anything less was deemed sufficient in avoidance, than direct proof of a new contract.”
 

 To the same effect was the decision in Beck v. Howard, 3 La.Ann. 501. And from Linton v. Stanton, 4 La.Ann. 401, we quote : “It has been often held that a new promise to pay a debt discharged by certificate, must be express, distinct, and unequivocal. The intention of the bankrupt to bind himself must be clear.”
 

 In Bartlett v. Peck, 5 La.Ann. 669, it was held that the following expression in a letter written by the bankrupt, Peck, to the plaintiff, Bartlett, after Peck was discharged in the bankruptcy proceeding, was not sufficient to sustain a judgment against Peck — viz: “I expect to pay you as fast as I can in money, not in property.” In the opinion the court declared:
 

 “The discharge in bankruptcy operates the release of the debt, as prescription does;
 
 *435
 
 and a subsequent promise to pay is a new obligation of which the preexisting debt is only the consideration. The obligation must, therefore, clearly result from the words used, or it cannot be enforced.”
 

 In Glenn v. Dunbar’s Adm’x, 10 La.Ann. 253, one of the reasons for holding that a letter written .by the bankrupt to the creditor, Glenn, did not constitute such a promise as to sustain a judgment against the bankrupt’s estate was that it was neither alleged nor proved that the bankrupt’s affairs “so prospered after the letter as to give him the ability to pay”. In the present case the evidence leaves no doubt — and there seems to be no dispute about it — that Hunnewell has never been financially able to pay the claim of Dr. Irwin.
 

 In Collier on Bankruptcy, 13th Ed., Vol. 1, § 17, p. 643, and in Gilbert’s edition of the same work, 4th Ed., § 17, p. 385, the rule is stated thus:
 

 “Whether oral or in writing, the promise must be definite, express, distinct, and unambiguous”.
 

 In 8 C.J.S., Bankruptcy, § 583, p. 1571, the rule is stated thus:
 

 “In order to revive a liability on a debt discharged in bankruptcy or to create a new enforceable obligation, there must be an express promise to pay the specific debt, made to the creditor or his agent, and while no particular form of language is necessary, to constitute such a new promise there must be a clear, distinct, and unequivocal recognition and renewal of the debt as a binding obligation, anything short thereof being insufficient, as, for example, the mere acknowledgment of the discharged debt, or the expression of hope,, desire, expectation, or intention to pay or revive the same.”
 

 It is not necessary to decide now whether a verbal promise to pay the discharged debt would be enforceable if Hunnewell had given such a promise directly and unequivocally in the message which he sent by Connell to Dr. Oakley, because no such direct or unequivocal promise was given in the verbal message. The rule is stated in 6 Am.Jur., Bankruptcy, § 532, p. 832, thus:.
 

 “Unless otherwise provided by statute, an enforceable promise to pay a discharged debt may be made orally. The promise-must, however, be either express or directly implied in the terms used; it cannot be-implied simply from conduct recognizing the debt, for example, from a payment on-account of either principal or interest. No-particular form of words need be used-provided the promise is clear, distinct, and unequivocal, and is constituted of words; which in their natural import identify the-debt and express a present intention on the-part of the bankrupt to bind himself to its. payment. A simple acknowledgment of the-justness of a debt and of its present existence as a debt formerly contracted and now unpaid, or the expression of a hope, desire,, expectation, or intention to pay, is not sufficient. Nor is the effect of a discharge-avoided by a promise to do something other than pay the discharged debt.”
 

 And, with reference now to the-unaccepted offer of Hunnewell to turn, over to Dr. Irwin the $3,000 life insurance policy, we quote the following paragraph.
 
 *437
 
 from the same section, p. 533 of 6 Am. Jur., — thus:
 

 “A
 
 mere offer or proposal to make a new contract for the payment of the discharged debt does not avoid the effect of the discharge, although an enforceable contract may be created by the creditor’s ac-ceptance of the offer.”
 

 In Allen & Co. v. Ferguson, 18 Wall. 1, 85 U.S. 1, 21 L.Ed. 854, the rule is stated and illustrated thus: ■
 

 “The promise by which a debt discharged in bankruptcy is revived must be clear, ■distinct and unequivocal.
 

 “A promise inferred from the following words in the letter of the defendant, ‘Be satisfied; I intend to pay all my just debts; .all will be right betwixt me and my just ■ creditors,’ is not a promise to pay plaintiff’s debt.”
 

 Our conclusion is that the judgment appealed from is correct.
 

 The judgment is affirmed.